J-A20012-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.M.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 398 WDA 2021 |

Appeal from the Order Entered March 3, 2021
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000068-2020

BEFORE: PANELLA, P.J., BENDER, P.J.E., and McCAFFERY, J.

MEMORANDUM BY PANELLA, P.J.:  **FILED: SEPTEMBER 30, 2021**

A.O.B. ("Father") appeals from the decree terminating his parental rights to A.B ("Child"), who was born in May 2007. Father argues the trial court erred by finding that Allegheny County Office of Children, Youth and Families ("CYF") presented clear and convincing evidence that he had not remedied the conditions that led to Child's removal from his care and that termination of his parental rights would be in the best interests of Child. As we conclude the record supports the trial court's conclusions, we affirm.

CYF has had periodic involvement with Father, Child, Child's biological mother ("Mother") and Child's sibling[1] since 2013, with referrals being

_____

[1] Mother's parental rights to Child have also been terminated, and that termination is not part of this appeal. Child's sibling is also not involved in this
*(Footnote Continued Next Page)*

received in 2013, 2014, 2015, 2016 and then in January and October of 2018. The basis for the referrals ranged from reports of Father's physical abuse of Child to Child being left alone and locked out of the house until Father returned from work. These referrals did not result in court involvement.

On December 28, 2018, however, CYF assumed emergency care of Child after learning that Father had left Child, who was 11 years old at the time, alone and locked out of the family home while he took a trip to Canada.[2] Child was placed in foster care with Father's former paramour, who was active in Child's life, and Child remains in that placement.

Child was adjudicated dependent. CYF set several reunification goals for Father, which included completing a parenting program, cooperating and maintaining communication with CYF and attending family plan meetings, completing court-ordered psychological evaluations with Dr. Gregory Lobb and having supervised visits with Child. However, Father attended only one of eight scheduled family planning meetings from start to finish.[3] He did not

_____

appeal, as he lives in Africa, where Father is from and where the sibling is being cared for by Father's family. A CYF caseworker testified that Father told her that he had sent the sibling to Africa to avoid him being placed in CYF's custody. *See* N.T., 2/5/21, at 153.

[2] Father was also charged with endangering the welfare of a child in connection with this incident, but the charges were later withdrawn.

[3] Father did initially attend a second meeting by phone, but hung up before the meeting had concluded. When the caseworker called him back, Father told the caseworker to stop contacting him.

engage in services CYF referred him to, and only spoke to Dr. Lobb on the phone after missing his first two appointments with him. Father has not had any visits with Child since she has been in care, and Child has not asked for any visits with Father.

On June 12, 2020, CYF filed a petition to terminate Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5) and (a)(8) and (b). CYF and Father subsequently learned that Mother had filed a support action for Child against a person other than Father, prompting Father to request a paternity test. The paternity test confirmed that Father is Child's biological father.

Father contested the termination petition, and the court ultimately scheduled a hearing for February 5, 2021. Before testimony at the hearing began, the parties entered into several stipulations. Those stipulations included the fact that the trial court had exclusively held over the life of the case that Father had not been compliant with the permanency plan and had made no progress towards alleviating the circumstances necessitating Child's placement in foster care. The parties also stipulated that Child had been in foster care for over two years as of the date of the hearing. *See* N.T. Termination Hearing, 2/5/21, at 14-15.

Following the stipulations, Father asked to address the court. He requested that the court recuse itself because it had placed Child in a foster home that allowed for the consumption of pork, which ran counter to Father's

- 3 -

religious beliefs as a Muslim. The court refused to recuse itself and proceeded to the hearing.

CYF called Erin Snyder, a casework supervisor at CYF, to the stand. Snyder testified that it "was an ongoing effort to try to engage" Father. *See id*. at 102. She described Father's cooperation and communication with CYF as "minimal." *Id*. at 113. She elaborated:

> There have been times where the agency has been able to reach Father. But it is very inconsistent. There are large lapses in time between communications with Father. It's been very tense when we do have conversations with him. Again, a lot of accusing CYF of mishandling the case and an unwillingness to engage with any court-ordered services.

*Id*. at 113-114.

Snyder testified that the agency attempted to contact Father through various forms of communication. *See id*. at 104. She personally sent him letters, explaining that Child was in CYF's care and he would need to make progress on his reunification goals within a certain period of time in order to have Child returned to his care. *See id*. at 118-119. Father, however, did not respond. *See id*. at 119. Snyder also stated that she sent Father texts, but he did not respond to those either. *See id*. at 119-120. Although Father told Snyder that he had sent weekly emails to a CYF caseworker, Dan Brown, Brown could only find two emails from Father that were sent in April of 2020. *See id*. at 120-121.

Snyder also testified about Father's failure to engage in court-ordered services. She recounted that CYF had referred Father to a supervised

therapeutic visitation program, but he declined to participate. *See id*. at 121-123. CYF also referred Father to Allegheny Family Network's DAD's Program, but he also did not engage in that program. *See id*. at 121. Snyder explained that CYF had never even been able to complete a full assessment for services for Father because Father refused to meet with CYF in order for the agency to do the assessment. *See id*. at 115-116.

Snyder further testified that Father had never had a visit with Child in more than two years she had been in the foster home. *See id*. at 123, 127. She stated that, although there was a period of time that Father and the foster mother spoke on the phone, Father never asked about Child or how she was doing. *See id*. at 144-145.[4] Snyder testified that Child did not have a bond with Father, and their relationship, which was difficult even before placement occurred, "has only gotten worse." *Id*. at 131. Child did not request any visits with Father, and did not wish to visit Father. *See id*. at 143. In contrast, Snyder recounted, Child is very bonded with her entire foster family and Snyder had no "doubt that [Child] needs to stay in [their] home." *Id*. at 128-130.

Loretta Brown, a father engagement specialist for CYF, also testified. Brown explained that a father engagement specialist becomes involved in a

---

[4] The parties stipulated that the foster mother obtained a PFA order against Father on October 8, 2020, which prohibited Father from contacting the foster mother. *See id*. at 13-14.

case when a caseworker is having difficulty locating or engaging the father. *See id*. at 71. Brown testified that she made contact with Father during an unannounced visit to his home. According to Brown, Father talked so negatively about Child - even calling her a racist - that Brown took the unusual step of asking Father whether he liked Child. *See id*. at 71, 76-77. Father's response was that he was obligated to care for her. *See id*. at 71.

CYF also called Dr. Lobb, who the parties stipulated to be an expert in psychology, to the stand. Dr. Lobb testified that he had evaluated Child and her foster parents, and they had a strong bond. *See id*. at 23. He also testified that Child told him she does not want to live, see or even talk with Father. *See id*. at 33.

Dr. Lobb testified that he had spoken to Father twice on the phone. *See id*. at 24.[5] According to Dr. Lobb, Father felt that everybody was against him and that he generally saw himself as a victim. *See id*. at 29-30. Dr. Lobb explained that this narrative made it difficult for Father to see his role in the situation he was in with Child and the responsibility he had for that situation. *See id*. at 30. Dr. Lobb stated that Father felt it was the foster mother and CYF that were the barriers to his ability to repair his relationship with Child. *See id*. at 31. While Dr. Lobb acknowledged that Father had made it very clear that he did not want Child in the foster home she was in, *see id*. at 32,

_____

[5] These conversations occurred on June 25, 2020 and December 15, 2020, after the termination petition had been filed against Father on June 12, 2020.

and that the foster mother may be one of the barriers in Father's relationship with Child, it was Dr. Lobb's opinion that there were "multiple barriers" regarding Father's ability to parent Child. *Id*. at 31.

Dr. Lobb opined that it would take more than a year of therapy for Child and Father to repair their relationship, and that could only occur if both Child and Father were amenable to the idea of therapy. *See id*. at 35. And it was clear that Child did not, Dr. Lobb noted, have any interest in engaging in therapy with Father. *See id*. at 34, 35. Dr. Lobb also opined that it would be in the best interests of Child to be adopted and that Child had repeatedly made clear that was her wish, *see id*. at 36, and a continued delay in establishing permanency for Child would not be in her best interests. *See id*. at 58.

Father testified at the hearing. He acknowledged that he had told CYF that he would not visit Child as long as she was living in her current foster home. *See id*. at 168. However, he stated that he then requested to visit Child in April of 2020 and that he had wanted to visit her since then. *See id*. at 169-170. However, he recounted that he was told that she did not want to see him. *See id*. at 170.

Following the hearing, the court entered an order which stated that CYF had presented clear and convincing evidence that Father's parental rights should be terminated pursuant to Sections 2511(a)(1), (a)(2), (a)(5) and (a)(8) and that such termination would serve the needs and welfare of Child. Father filed a timely notice of appeal, and complied with the court's directive

to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. In response, the trial court issued a Pa.R.A.P. 1925(a) opinion stating that the court had properly terminated Father's parental rights pursuant to all four statutory grounds because Father had not met any of the goals that had been set for him in the more than two years that Child had been out of his care, and terminating his parental rights was clearly in the best interests of Child. On appeal, Father takes issue with both of these conclusions, and raises the following two claims challenging the court's order terminating his parental rights:

> 1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8)?

> 2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Appellant's Brief at 6.

When this Court reviews an order terminating parental rights, we must accept the findings of fact and credibility determinations of the trial court as long as the record supports them. *See In the Interest of D.R.-W.*, 227 A.3d 905, 911 (Pa. Super. 2020). If the findings of fact are supported by the record, this Court may only reverse the order if the trial court made an error of law or abused its discretion. *See id*. We may not reverse merely because the record could support an alternate result. *See id*. Instead, we give great

- 8 -

deference to the trial court because trial courts often have the opportunity to observe the parties first-hand over the course of multiple hearings. **See In re Adoption of K.M.G.**, 219 A.3d 662, 670 (Pa. Super. 2019). Further, the trial court, as the fact-finder, is free to believe all, part or none of the evidence presented and is likewise free to resolve any conflicts in the evidence. **See id**.

Termination of parental rights is controlled by Section 2511 of the Adoption Act. **See** 23 Pa.C.S.A. § 2511. Under Section 2511, a trial court must engage in a bifurcated process prior to terminating parental rights. **See In re L.M**., 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the trial court must find that the party seeking termination has proven by clear and convincing evidence that the parent's conduct satisfies any one of the eleven statutory grounds set forth for termination under Section 2511 (a). **See id.**; 23 Pa. C.S.A. § 2511 (a)(1-11). If the trial court finds that one of those subsections has been satisfied, it must then, pursuant to Section 2511(b), make a determination of the needs and the welfare of the child under the best interests of the child standard. **See In re L.M.**, 923 A.2d at 511; 23 Pa.C.S.A. § 2511(b).

Here, regarding the first prong of the analysis, the trial court found CYF had proven by clear and convincing evidence that Father's conduct met the grounds for termination of his parental rights under Sections 2511(a)(1), (a)(2), (a)(5) and (a)(8). Father does not challenge the subsections individually, but rather makes the broad assertion that the trial court erred by

terminating his parental rights under all four subsections. This Court has made clear, however, that it only needs to agree with the trial court that CYF met its burden as to any one subsection in order to affirm the termination of parental rights. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we conclude that the trial court correctly determined that CYF met its burden pursuant to Section 2511 (a)(8), which provides that parental rights may involuntarily be terminated on the grounds that:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)8).

Under Section 2511(a)(8), the moving party must produce clear and convincing evidence that: "(1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." **In re Adoption of M.E.P.**, 825 A.2d 1266, 1275-1276 (Pa. Super. 2003). In addition, we have explained the following:

> Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the [child]'s removal by the court. Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period.

> Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services.

*In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citations and quotation marks omitted).

We are also mindful that this Court has stated that a parent is required "to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002) (citation and quotation marks omitted). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *See id.*

Father does not dispute that 12 months had elapsed since Child was removed from his home, as the parties stipulated at the termination hearing that Child had been in her foster home for over two years by that point. *See* N.T. Termination Hearing, 2/5/21, at 15. Rather, Father argues that there was "insufficient evidence to support a determination that Father failed to remedy the conditions that kept [Child] in care." Appellant's Brief at 22. The record, however, plainly belies this assertion. Snyder's testimony at the hearing made it abundantly clear that Father had failed to meet all but possibly one of his reunification goals, which included completing a court-ordered evaluation with Dr. Lobb, cooperating and communicating with CYF, attending parenting classes, and visiting Child. As aptly summarized by CYF:

> The only steps Father has taken to reunify with [Child] in over two years were two telephonic interviews with the psychological evaluator in this case [which only occurred after CYF filed the termination petition], who recommended that [Child] be adopted. Father declined therapeutic supervised visitation. He did not cooperate or communicate with the agency. He did not engage in a parenting program. Father has not visited with [Child] in over two years.

Appellee CYF's Brief at 27-28. Clearly, this documentation of Father's failure to address, much less meet, the majority of his goals for reunification over a two-year period supports the trial court's conclusion that CYF established by clear and convincing evidence that termination was appropriate under Section 2511(a)(8).

Father argues, however, that Child "did not remain in foster care because of any failures of Father." Appellant's Brief at 17. Instead, Father summarily contends that reunification "never had a chance once [Child] was permitted to refuse visitation and the foster home was permitted to alienate [Child] from her religion." Appellant's Brief at 19.

In the first instance, Father's argument only highlights Dr. Lobb's assessment that Father sees himself as a victim and is not willing to take responsibility for his role in his unsuccessful reconciliation with Child. Moreover, it completely fails to account for the fact that it was Father who was the one who refused to visit Child at times. **See** N.T., 2/5/21, at 123 (Snyder testifying that "at various times Father declined to visit and at various times [Child] declined to visit").

In any event, Father's undeveloped argument does not establish that the trial court improperly terminated his parental rights under Section 2511(a)(8). Father has not demonstrated that the foster home "chang[ed] [Child's] religious practices," as he asserts in his brief. Appellant's Brief at 19. And while it is true that Child had the ability to refuse to visit Father, that was pursuant to a court order that visitation between Father and Child would be at the discretion of Child. **See** N.T., 2/5/21, at 124. Child has made it more than clear that she does not want to visit Father. Dr. Lobb explained the reality of the situation this way:

> [Child] is a 13-year[-]old, almost 14-year[-]old child. It would be near impossible to physically pick her up and take her to visits. And I feel without some buy[-]in from her, that would be disastrous probably.

*Id*. at 43. He confirmed that it would not be in Child's best interests to "physically compel [her] to go to a visit." *Id*. at 44.

Although Father now claims he is "willing to engage in services" with Child, Appellant's Brief at 22, this Court has made clear that "[t]ermination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services." *In re Z.P.*, 994 A.2d at 1118 (citations omitted).[6] Moreover, while Father also asserts the

_____

[6] Father also appears to question Dr. Lobb's ability to evaluate him because of a "language issue." Appellant's Brief at 23. Father observes that he grew up
*(Footnote Continued Next Page)*

court erred by finding that termination would best serve Child's needs and welfare, as we explain more fully below, the record reflects the opposite.

Based on all of these circumstances, we see no error or abuse of discretion in the trial court's conclusion that CYF had established by clear and convincing evidence that termination was appropriate under Section 2511(a)(8).

We therefore turn to Father's argument that CYF failed to establish that termination was justified under Section 2511(b). Pursuant to Section 2511(b), the trial court is required to examine whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of Child. **See In re C.M.S.**, 884 A.2d 1284, 1286-1287 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." **Id**., at 1287 (citation omitted).

Our Supreme Court has stated the following:

[I]f the grounds for termination under subsection (a) are met, a court shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. . . .  In **In**

---

speaking Fula. In rejecting any claim that a language barrier somehow prevented Father from meeting his goals, the trial court stated that it had observed Father on many occasions, and it appeared that Father understood and appropriately answered the questions being asked by counsel and the court. **See** Trial Court Opinion, 5/25/21, at 16 (unpaginated); **id.** at 16 n.3 (unpaginated) (stating that "it was this Court's conclusion that there were not language barriers preventing Father from participating"). Moreover, Dr. Lobb specifically addressed how Father's language nuances may have affected his evaluation.  **See** N.T., 2/5/21, at  28-29.

*re E.M.*, 620 A.2d [481,] 485 [(Pa. 1993)], this Court held that the determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some citations and quotation marks omitted).

In a termination of parental rights case, the trial court is required to consider "whatever bonds may exist between the children and [the natural parent], as well as the emotional effect that termination will have upon the children." *In re Adoption of A.C.H.*, 803 A.2d 224, 229 (Pa. Super. 2002) (citation omitted). The extent of any bond analysis necessarily depends on the circumstances of the particular case. *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008). The panel in *In re K.Z.S.* emphasized that, in addition to a bond examination, the court can equally emphasize the safety needs of the child and should consider the intangibles, such as the "love, comfort, security, and stability," the child might have with the foster parent. *Id.* at 760 (citation omitted).

In the instant case, the trial court found that CYF had presented clear and convincing evidence that termination was in the best interests of Child. We agree. In addition to the testimony from Dr. Lobb and Snyder that termination of Father's parental rights was in the best interests of Child, CYF also presented the testimony of Lori Marshall, the caseworker for the foster care agency overseeing Child's case, and Wendy Lyons, the permanency

caseworker for CYS. The testimony from both of these caseworkers only adds further support to the trial court's conclusion that termination was in Child's best interests.

Marshall testified that she has been assigned to Child's case since Child was placed in the foster home and that she has visited her, either in-person or virtually, every two weeks since then. **See** N.T., 2/5/21**,** at 78-79. Marshall testified that she has never seen anything negative occur in the foster home and that Child has a very strong bond with both her foster mother and her foster father, though her foster mother was her "number one person." **Id**. at 80-81. Marshall also testified that Child has a positive relationship with the three biological children of her foster parents, and Child was not treated any differently than her foster siblings. **See id**. at 80. She reported that Child was excelling at sports and academics, having made the travel team for basketball and the honor roll at school. **See id**. at 79. Marshall said that she would be very concerned if Child were to be removed from this home, and Child is "petrified" that something will prevent her from being adopted by her foster parents. **Id**. at 82, 85. She did not think terminating Father's parental rights would have any negative impact on Child. **See id**. at 82.

Lyons likewise testified that Child is very bonded with her foster family. **See id**. at 88. Child calls her foster mother and foster father "mom" and "dad" and is very clear in her desire to be adopted by them. **See id**. 88, 90. Lyons stated:

> [Child] is very much an integral part of [the foster family]. The relationship with each member is strong. She belongs there. That's her house.

*Id*.

In contrast, Lyons stated that Child wants nothing to do with Father. *See id*. at 88-89. Lyons explained that she had grave concerns should Child be removed from her foster home. *See id*. In fact, Lyons believed it would "emotionally cripple" Child if that were to happen. *Id*. at 89. Like Marshall, Lyons did not have any concerns that termination of Father's parental rights would negatively affect Child. *See id*.

This record amply supports the trial court's determination that termination of Father's parental rights is in the best interests of Child. Father's bald assertions that his parental rights should not be terminated simply because Child is happy in her foster home, and because termination will prevent Child from "get[ting] the help she needs," Appellant's Brief at 29, do not in any way alter our conclusion that the trial court did not err in terminating Father's parental rights pursuant to Sections 2511(a)(8) and (b).

Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  9/30/2021

- 17 -